Our second case for this morning is Leland O. Stevens v. Leland Stevens Incorporated v. Interactive Financial Advisors and Red Tail Technology. Mr. Smith. May it please the court. Leland Stevens, plaintiff and appellant in this case, is a small businessman out of Virginia who started his business in 1983 as an insurance agent representative. Over the course of 30 years, he built his business to a book of business of about 650 clients. He's still in Virginia. He's always maintained his license to sell insurance and is seeking basically to get back his book of business. He collected the confidential client information in hard copy first. Then in around 2000, he started storing that information on an electronic database called ACT. Could you clarify for me whether he actually still is in possession of the hard copies or whether those were taken from him as well? He had the hard copies and provided the hard copies to the defendants as part of the discovery and litigation. He's always maintained... He has his own set of hard copies though?  I understand that computer databases are more convenient to work with, but in what sense is he denied access to this work product of his? It wasn't his database. This is this red tail company, right, that was working with Interactive. It is his database. Well, the company that maintains the data isn't him. It's this other company, right? And they were instructed by Interactive to, after he was no longer affiliated with Interactive Financial, they were instructed to terminate his access, right? The company red tail database is like a storage company. Am I right? At the time his affiliation with Interactive Financial ends, in the wake of these allegations of a Ponzi scheme and all the rest of it, Interactive Financial says to this maintainer of the database, red tail, terminate his access. Change the passwords, however they do it. Terminate his access. That's my understanding of what happened, which is why this whole lawsuit came about, right? Yes, that was one of the main reasons, yes. And then the other thing, the district judge grants summary judgment with respect to the particular items on the database that deal with financial services, the investment clients, and then has the trial on the insurance clients, right? Is that the 460-some or 400-some people? There's 220 accounts where clients had securities investments. And those are the summary judgment part, right? Isn't the trial on the insurance clients? He did allow the case to proceed to trial with the insurance clients. And the number is what, 400-some? Yes, but the point is that it's the same information. The information for the insurance clients is the same information for the securities clients, and these clients, all but 10, also had insurance products. But we have this SEC regulation, SP, and the district court read that as preventing, actually, as telling Interactive that he is no longer entitled to have access to this red tail database because he's not anymore affiliated. He's just like a third party out there in the world who's not affiliated with them. Regarding regulation SP, and it's in the final rule, privacy of consumer financial information promulgated by the SEC, a comment to that specifically excludes insurance and insurance-related investments. And that is precisely the kind of information that Leland Stevens has been collecting. But regulation SP prevents a registered investment advisor from disclosing any non-public personal information about a consumer to a non-affiliated third party. And after he's terminated, he's a non-affiliated third party. It really doesn't matter what's in the database. There's really no issue of disclosure because that information, confidential information, Leland Stevens had been collecting since 1983, 20 years before he even met the defendants. 90% of the client confidential information, he collected. I understand that. That's why I asked you about the hard copies, because the registered investment advisor isn't allowed to give this database to him under regulation SP, and they don't. Now, whether that hurts him and how much money it would cost him to go to a different database company to translate the hard copies again into a computer record, et cetera, I don't know. But the court rejects the idea that it makes any difference whether he's the owner of this investment client data. It says that's not what the text of the regulation says. Well, the fact is that there is no disclosure because IFA had no right to take his access away from the Red Tail database any more than they had the right to actually physically go into his office and take his hard copy files. Well, I mean... The clients entrusted him with the client confidential information. We're talking about what the interactive financial company can do with this data, and to take the data and to give it to a non-affiliated third party is what the regulation addresses. As I read the regulation, it doesn't care who generated the data. It doesn't care who owned it. It cares about whether you're an affiliated party or you're not. And he's not any more after his relationship ends with this company. If I may step back, Your Honor, the business model that IFA had with its independent advisory representatives was one where you really had about 40 representatives. You had over 40 different filing systems. IFA had its own filing system. It didn't even rely on Leland Stephens' Red Tail database. We had evidence in the record from other IARs whom they also took their databases, who did not have regulatory issues. Some of them didn't even keep electronic records. There was no requirement that the IARs keep their information on an electronic database. That all may be true. I'm not sure I see the relevance of it. Well, I mean, the relevance is that the IARs had complete discretion as to how they kept their records prior to this. But that doesn't mean that Interactive Financial doesn't have responsibilities. It's the registered investment advisor. It is subject to regulation, obviously, by the Securities Exchange Commission. And it has to comply with the SEC's rules. And, you know, Mr. Stephens wasn't able independently to provide investment advice to people. He had to affiliate with somebody. That's true, but if you look at the case law, those cases involve the transfer of information to, say, a non-affiliated party who never had the right to the information to begin with. All of the customers gave that information to Leland Stephens. He already had the customer's consent to have that information. Just because he became a non-affiliated person under Reg SP, that doesn't mean that he didn't have the right to have that information, particularly since all but 10. Well, that's the question. I mean, I understand that's your position. I think you've just articulated the question before us. Yeah, but all but 10 of the clients also had insurance investments. Insurance investments are specifically excluded from Reg SP. Just because they may also have securities investments, that doesn't mean that he didn't have the right to have that information as an insurance agent. All but 10 maintained insurance investments with Leland Stephens. I see. You're in your rebuttal time, if you'd like to say. Yeah, rebuttal time as well. Thank you. Mr. Rosenberg? Good morning. Good morning. May it please the Court. The property at issue in this case is information on the Red Tail database. IFA, as the investment advisor, had a contract with Red Tail Technologies to provide database management services. Mr. Stephens was able to use the Red Tail database because he received codes that were unique to the IFA-Red Tail relationship. There are two categories of information that are on the database. There's IFA client information, and there's non-IFA client information. At times, Mr. Stephens' briefing conflates the two, but they were dealt with separately in the district court. The first category is IFA clients. The second category is non-IFA clients. With regard to the IFA clients, Gramm-Leach-Bliley was enacted to allow financial institutions to offer insurance, brokerage services, investment services, banking services, and as part of that allowance, it required the financial institutions to protect information about their clients. The Securities and Exchange Commission, then two years later in 2001, passed Regulation SP, which as a default requires that a financial institution that's regulated by the SEC cannot share non-public personal information about clients with non-affiliates of that financial institution. And your position is it doesn't matter who generated the data or how the data came to be. Why isn't it a little artificial if he actually has all of this data in hard copy? Well, there are two issues. Number one, under the next financial case, which is a case brought by the SEC, it specifically states that who generated the information, who has the relationship with the clients, is not the issue. The issue is whether or not a firm can disclose non-public personal information about clients. The issue about him maintaining hard copies, he maintained hard copies when he left. That's not the issue that's before this Court. The issue that's before this Court is whether IFA was permitted to disclose that information on the database to Leland Stevens. And the answer is that he wasn't, that it wasn't. And so IFA implements this, if I remember, simply by issuing an instruction to Redtail to terminate his access? Correct. And that's also consistent with the compliance manual that Mr. Stevens signed. The compliance manual states, which reflected in IFA's privacy policy, which says once you're no longer associated with IFA, we are going to terminate your access to client information. And explain to me how he winds up commingling the investment client information with insurance client. So in addition to the IFA client information, there was a category of the commingled. There was IFA clients that also had insurance, and then he also put non-IFA clients, and that was dealt with by the jury. But the commingled cases, he talks about the Reg SP somehow having an exception for clients that also had insurance. That's not correct. Reg SP doesn't apply to insurance clients because the SEC doesn't regulate insurance companies. Gramm-Leach-Bliley required the states, which do regulate insurance companies, to pass regulations that govern insurance information. So insurance is covered, it's just not covered by Regulation SP. If we had a situation where someone who was an independent contractor, as Mr. Stevens was, as opposed to an employee, was able to get that information, in a sense we would have regulatory chaos. We would have financial institutions unable to convey to their clients what information is going to be protected and what's not going to be protected. If IFA, which has employees and also has independent contractors, if an employee leaves, the information is protected, but if an independent contractor leaves, the information is not protected, that would be regulatory chaos. But even if that were the case, that would be something that IFA would have to disclose in its privacy policy. One of the requirements under Reg SP, pursuant to Gramm-Leach-Bliley, is that to the extent that a financial institution seeks to share information with a non-affiliate, it has to disclose those categories of information to the clients. Well, it also has to jump through several hoops, right? Doesn't it have to go back to the clients and allow them to somehow opt out? Yes, exactly. So in their privacy policy, they say to the clients, if it were the case, and it's not, that IFA were to want to share information. Right, IFA, I gather, just has this across-the-board rule, we don't disclose. Right, we have a rule that says we don't disclose. Had we had some rule that said we're going to disclose insurance information, we're going to disclose to independent contractors, IFA would have to have in its privacy policy, this is what we disclose, and clients, this is how you opt out of that disclosure, and then it has to have a step-by-step process that explains the mechanics of opting out, to make sure that to the extent that a client doesn't want anything disclosed, it doesn't get disclosed. But you never reach that point because you've got the simpler policy. Correct. We don't share non-public personal information about clients. And I guess the other critical move is that you take the position that once somebody's not working for you anymore, you know, affiliated with you anymore, they are a non-affiliated third party. That's correct. It doesn't matter when the information, that they were affiliated when they put the information in the system. Correct. And that's the definition under Regulation SP, is once you're not controlled by shared control, et cetera, with the financial institution, you are not an affiliate. And one of the interesting cases that we see that the SEC brought is the Santos case, which came out in March of this year. And that case literally involved a representative who formally serviced the client accounts. That representative was out of the business, and the current representative at the firm shared information just to help obtain useful ideas on how to manage those accounts. The SEC said, no, we don't care that that representative priorly serviced those clients. He's not affiliated, and you can't share that information. Could I ask you a question about the jury instruction? There was this back and forth about the demand element for a conversion case, which we didn't talk about in the main argument, but maybe we will. Are there any Illinois cases that actually explicitly say that a lawsuit isn't enough? Why wouldn't a lawsuit be enough for demand? Well, so that's a two-part question. One is, are there cases? The answer is yes. And two, I'll explain the second answer first. If every complaint satisfied the demand element, then why would there be a demand element? It would be superfluous if it's always going to be satisfied. Do you see it as something sort of like filing charges with the EEOC in a Title VII case? It gives a window during which maybe an amicable resolution can take place before it degenerates into litigation. And that leads me to your first question, which was the Runnymede case by this court in 1988. And that said exactly that. It said in a footnote that as a prerequisite to filing a conversion claim, the plaintiff must make a demand, a pre-litigation demand, for the return of the property. And the court explained why. So there's a public policy, exactly as Your Honor said, that we want to see if we can resolve these things without subjecting the defendants to needless litigation. There also are a number of cases that have been dismissed for failure to make a demand, a series of cases out there. And so the question is why would those cases exist were a complaint to satisfy the demand element? Now the district court, as I recall in the supplemental instruction, when he said a lawsuit isn't going to do it, also reminded the jury that there's a futility exception to the demand requirement. Correct. And that's one of Mr. Stevens' arguments. That, well, to the extent that I needed to make a demand, it would have been futile, so there's an exception. Well, that's not relevant to this appeal because, yes, that was in the original jury instruction, and Judge Connelly reminded the jury of that very issue in the supplemental instruction. Right. The one case that Mr. Stevens relies upon is the McNeil Automotive case, and that was a memorandum order. It was not dealing with whether a complaint satisfied the demand element as an issue in the case. In fact, in that memorandum order, and also in another published decision in the case, it discussed twice that there was a pre-litigation demand in that case. That case also denied the plaintiffs' motion for judgment on the pleadings, so there was not any in-depth analysis other than just to make the statement. That case, the McNeil Automotive case, relied on Lepar v. Rockford. Lepar v. Rockford, though, is not a conversion case. It did mention the word conversion in the last paragraph of the case, but that case was a post-Great Depression case that dealt with a bank in receivership, and the receiver made a distribution to a municipality that was a customer when it should have made a distribution to an individual who was a customer, and that case dealt with the interest. When interest begins to be calculated, the municipality has to pay. At the very end of the case, it said, well, the earliest it could have been calculated is when the demand was made, and we see this is when the complaint was, so this is when we're calculating interest. There was no in-depth analysis of whether the demand element of a conversion claim is satisfied by the complaint. Even in 1938, there does not appear to be the demand element. Well, I don't see the demand element, quite frankly, until the 70s, kind of developing in the common law, in the Hobson case. Yeah, I didn't think anybody was really debating whether there is a demand element. I think the question has been what qualifies as a demand. Correct. So if there are no further questions, I ask that this Court affirm the district court. All right. Thank you. Anything further, Mr. Smith? It's important in reviewing the case law under Reg SP to be aware that the issue is not with the representative or the entity that that representative is with. The issue is with the disclosure of that information to third parties that never had the right to the information to begin with. But actually, Mr. Rosenberg is saying that's not the case, that the SEC is very focused on who has the information and to whom, and just whether it's an insider or an outsider because consumers have this right to opt out of disclosures. There are all sorts of rights that can't be administered if it's read the way you're talking about it. Well, Mr. Rosenberg mentioned Santos, and there you had a representative who departed and did not have any rights to that information, which is very different than the situation that Leland Stevens was in. Again, he alone collected the information for all the clients. IFA didn't collect the confidential information for a single client. So the logic of your position is that an investment, a financial advisor needs to figure out who collected each piece of information in its system and permit disclosure to the collector, even if the collector has long since left and gone on to work for three different companies or has wound up in federal prison or otherwise just not there anymore, because that doesn't look like what SP says to me. This is where the confusion is. IFA has the right to its system of information to keep it confidential or not have anyone have access to it. IFA, that's fine, but IFA doesn't have the right to deny Leland access, Leland Stevens access to his own information. He's not the only person who ever collected information. IFA has employees. IFA has other independent financial advisors. And your theory is that under the regulation, IFA has to disclose to whoever created the information on the red-tail system. Why is Mr. Stevens separate? First of all, there was no requirement at all that anyone use IFA, so I take strong exception to the idea of commingling. There is no commingling. Each individual advisor maintained their information the way they wanted to, some in hard copy, some on ACT database, some on red-tail. Red-tail, I mean, IFA only had five employees. They had 40 independent advisors. Each had responsibility for their own systems. And I think what it fundamentally gets down to is that just as Leland Stevens had the right to maintain the confidential information in the hard copy files that he had collected as an insurance agent, just because that information became electronic, that doesn't mean that somehow he lost rights to that information. I mean, IFA had no rights to deny him access to the red-tail database any more than they had the rights to go into Virginia and take his hard copies away from him. Even though they were the ones who had the contract with red-tail. He didn't have a separate contract. No, he had a separate contract with red-tail. He actually entered into an agreement with red-tail prior to the IFA red-tail agreement. And again, he kept that same information on the ACT database. Basically, for IFA to comply with its own regulatory rules and regulations, they just had to deny him access to the IFA files. They had no responsibility for his hard copy files or his files he had as an independent insurance representative. The company that actually had control of the funds, TCA, simply blocked access to him to those files. So once they did that, they complied with all of their regulatory requirements. And that's what I'm saying. This case is not about disclosure. He had legitimate possession of the information to begin with. He always had legitimate possession of the client non-public information. Well, it has to be about disclosure at some practical level because he wouldn't even be here. If he already had all of the things that he wanted, you wouldn't have brought this lawsuit. So he wants a transfer of information, so to speak, just to avoid the word disclosure to happen. And so that is, in fact, what the case is about, is disclosure. What they essentially did was, again, to use an analogy, was to go in and take his hard copy files away from him so that he was unable to contact his clients using the means that he had before. I mean, that's why I'm saying it's an issue of taking and not disclosure because he always had legitimate right to possess that information. He always had that right. I mean, some of the information we're talking about, he started collecting in 1983, 20 years before he even met IFA. He actually bought and sold the book of business with advisory clients. The IFA then used as a windfall. I mean, IFA has made over a million dollars on accounts that Leland Stevens brought to them. IFA even said that had the departing representative wanted to sell, only if they wanted to sell, they would buy it from them or the estate. So even a dead person could theoretically sell an estate to IFA. I mean, can a dead person qualify under Reg SP to do anything? Of course not, but the fact of the matter is that the law recognizes the rights that Leland had to that information as his book of business. Even in the case law cited by the defendants, those representatives, they recognize they have a right to maintain client information that they collect for the clients that they service. I mean, we have over 40 different filing systems, not one. If I can just finish up with regards to the lawsuit as a demand, we made that allegation in the… Okay, I think you need to finish quickly. We made that allegation in the complaint. Let me just quote from the part. They basically said that the retention of money after demand amounted to a conversion from the date of the conversion. They were talking about takings. They were essentially talking about the same types of dynamics, and Leland Stevens also made a request for injunctive relief, which is an immediate demand for money. Okay. Thank you very much. Thanks to both counsel. We'll take the case under advisement.